The next argument for today is in case numbers 21-1778 and 22-351 United States v. Avenatti May it please the court, Daniel Habib, Federal Defenders of New York, on behalf of Michael Avenatti All agree that Michael Avenatti committed no crime Could we just pause for one second? Yes, I apologize. It's a good place to stop. Sorry. Judge Walker, are you there? Yes, I'm here. I'm sorry. Okay. Let's wait a minute. We'll just reset the clock and start over. Okay. Judge Walker, you're back. May it please the court, Daniel Habib, Federal Defenders of New York, on behalf of Michael Avenatti All agree that Michael Avenatti committed no crime when he threatened to expose Nike's improper payments to amateur basketball players unless the corporation settled Gary Franklin's claims for breach of contract and tortious interference with contract. Below, the government proceeded on a theory ratified by the district court in denying motions for judgment of acquittal that that threat became not only wrongful but criminally extortionate and amounted to honest services fraud when Mr. Avenatti paired it with a request that Nike hire him and another attorney, Mark Garagos, to investigate the corporation's misconduct. Those rulings were erroneous and should be reversed for two reasons. First, Avenatti can reasonably have believed that he had been authorized by his client to seek an internal investigation of misconduct in Nike's elite youth basketball program. The district court charged the jury that if he had an honest belief that what he was doing was authorized by his client, he could not be found guilty. So I want to be clear as to whether you're arguing that the evidence was insufficient as a matter of law to allow the jury to conclude that he didn't have such an honest belief? Yes, our principle argument is that the evidence was insufficient as a matter of law for the jury so to conclude. Our backup argument is that the district court's instructions on the scope of Mr. Avenatti's authority were circumscribed and erroneous, and as a result, the jury's conclusion, even if supported by sufficient evidence, is not a reliable basis for the judges. A deficiency challenge and a charge challenge. That's right, and if this court concludes, of course, that the evidence was insufficient, the remedy is reversal, and if the court concludes instead that the instruction was erroneous, the remedy is vacater and remand for a new trial. To resume, an internal investigation would have aligned with Gary Franklin's objectives of achieving justice, of ensuring that Carlton DuBose and Jamal James were removed from Nike's program. It certainly could and was made. I guess the government, though, is pointing us to the parts of the demand for the hire that would have allowed the company to receive whatever report and not do anything with it, which would not have been consistent with Mr. Franklin's objectives, and more to the point that it could have not hired Mr. Avenatti, paid in double whoever they hired, I mean, I hope I've got the scheme correct, and that that was certainly not in Mr. Franklin's interest. So help me out with how the jury, in light of those facts, could not have found this to be a wrongful and extortionate demand. So as to the first, Judge Rogge, there was testimony that it's true of all internal investigations that the decision whether to report the misconduct belongs to the client. Mr. Avenatti, in representing Nike, in conducting an internal investigation, could develop facts and submit them to the corporation, but any attorney who conducts an internal investigation for a corporate client understands that at the end of the day it's the client's decision what to do with the result. Your argument is this is a settlement negotiation on behalf of Mr. Franklin, and it seems difficult to me to understand, and therefore I wonder why the jury couldn't have concluded that that's not an offer anybody would have made in good faith attempts to settle this matter, because it just wasn't in Mr. Franklin's interest to have Mr. Avenatti do that kind of an investigation. Well, again, there were two components to that settlement offer. The first was a $1.5 million settlement for Mr. Franklin, which is more than Mr. Franklin had requested. And second, it was within the scope of Mr. Avenatti's authority, the broad authority afforded to him by California law, to take reasonable measures in his discretion in the service of his client's objectives to conclude that while he could not personally guarantee that Nike would fire any particular employee, what he could do is bring to Nike's attention misconduct committed by those employees that warranted their dismissal and that indeed warranted wholesale reorganization of elite youth basketball. Why don't you deal with the second part of the offer, the or pay me double what you're going to pay whoever you do have to do the investigation? So that, as described by Mark Geragos, who, by the way, if I may drop a footnote, was originally named in the complaint in this case as an unindicted co-conspirator, was dropped from the superseding indictment. And as Judge Garfi pointed out at sentencing, it was never cogently explained why that occurred and why Mr. Avenatti was prosecuted and Mr. Geragos, who sat by his side at those meetings, was not. But to come back to the main text, Judge Raggi, the answer is that, as Mr. Geragos explained, that provision was designed to ensure that any investigation would be a legitimate investigation. In Mr. Geragos' experience, if Nike selected counsel, for example, if Nike retained Boyce, Schiller, Flexner, Mr. Geragos and Mr. Avenatti feared that the investigation would be nothing but a whitewash. And indeed, the United States Attorney's Office for the Southern District of New York had been investigating Nike since 2017. Nike had surely become aware in the course of that investigation of the very misconduct that formed the basis for Mr. Franklin. How does that go to the question of the doubling of the fees if Avenatti doesn't do the investigation? You know, it may be a whitewash, it may not be a whitewash. And I don't see how that relates to Avenatti saying if it goes to someone else, you must pay us double the amount. It's a disincentive to hire another firm and it's an incentive to hire Mr. Avenatti because he's confident, given his knowledge of the tip of the iceberg as conveyed to him by Gary Franklin, that he and Mr. Geragos can get to the bottom of the investigation in a way that he does not... In any event, the jury was free to see that as... see the request, if they wanted to see a request to do the investigation by Mr. Avenatti, as a cover for this rather massive payment that went way beyond anything that was contemplated by Mr. Franklin in order to save a firm that was in financial difficulty. Wasn't there sufficient evidence for the jury to have reached that conclusion? So, Judge Walker, a couple of responses. First, as to the size of the demand, the district court instructed the jury that wrongfulness in this case did not turn on the size of the internal investigation demand. Second, if this court is prepared to draw that inference or conclude that a reasonable jury could have drawn that inference, I also want to emphasize we've made a second argument as to wrongfulness, which is that even if this payment is construed as nothing but a bald request for fees, it was still not wrongful for purposes of the criminal extortion statutes because it was authorized by controlling California law. In particular, Ramirez v. Sturdivant, which is discussed at length in our briefs. I just wanted to clarify, is this an alternative argument that the nexus between Franklin's claim and the demand is satisfied because it's attached to a settlement demand or that it's in fact itself has a nexus to the claim? This is, sorry, and this is the Ramirez argument Your Honor is asking about? Our argument on the Ramirez prongs is this. It is an alternative basis on which this court could find the evidence insufficient, should find the evidence insufficient as a matter of law to prove the extortion counts and to prove wrongfulness. Put in terms of Jackson 1, the fact that California law authorized Mr. Avenatti to seek his own fees at the same time that he sought his client's recovery, made it reasonable for him to believe that he was authorized to seek those fees. And as such, his demand was not wrongful in Jackson 1. Are you talking about the fees from the settlement? With Franklin, Franklin and Nike? Or are you talking about something else? I mean, the fees were 15 to 20 times the amount of the settlement to Franklin. If you call the $25 million demand, there was a 15 to $25 million demand fees. And at the end, there was no even question about that. And Avenatti offered one final deal, which was that they could pay one confidential settlement for $22.5 million and we ride off into the sunset. And if you need assistance, we'll provide that. But that's what Mr. Avenatti did. He wanted 22.5 at the end, $22.5 million for himself. I mean, maybe a million and a half, but I don't know. No, if I may, Your Honor, I don't think, with respect, the evidence bears the conclusion that the district court drew that the $22.5 million settlement was for Mr. Avenatti. It's quite clear from the sequence of events. Who was it for then? It was for his client, Your Honor. Mr. Franklin? Yes. And that's why, in the March 21st meeting, after that number was proposed, Mr. Avenatti took back the draft settlement agreement that had contained a $1.5 million payment term for Mr. Franklin, deleted that payment term, and replaced it with the word insert in brackets so that Nike could select which of Mr. Avenatti's proposals it might accept and insert the correct payment term. The problem you run into is a factual one, at least from the jury's perspective, because when that concept was presented during the recorded conversation, Avenatti said he didn't think it made any sense for Nike to be paying an exorbitant sum of money to Mr. Franklin. So isn't that strong an indication that this money was for Avenatti? No, Your Honor. I think that comment is best understood as explaining the value of Mr. Franklin's claim in contrast to the cost that would be required to conduct an internal investigation into misconduct that was potentially quite broad in scope. But it's clear it... Please. Well, as far as we haven't even discussed what Mr. Avenatti did or did not tell Franklin, but I don't think Franklin ever had any notion that he might be getting some 22 and a half million dollars here. He was looking for a million dollars, and initially they were going to settle for a million and a half, which was within the ballpark for Franklin. And that's all he wanted. And also, he wanted a continuous relationship with Nike. He wanted to go back and have a sponsorship and have everything the way it was before and not to have a Nike fury examining for sending in a lawyer who was preventing all this money. So, a few responses, Your Honor. First, the sequence of events during the March 21st meeting and as explained in some detail in our reply brief, in our view make it crystal clear that this demand for 22 and a half million dollars was a settlement demand that would have been paid to Gary Franklin. That's why Gary Franklin's name was on the draft settlement agreement, and that's why the agreement called for his signature. As to the possibility of... Was it to be paid into whose account? It was into an account to be, I believe, the settlement agreement called for it to be paid into an account to be specified by plaintiff's counsel. Right. I mean, that's why the jury could have been skeptical as to whether a deal that had first been presented as a million five to Mr. Franklin, then you pay me. And then it switches to 22.5 million, whether it was really for Mr. Franklin or not. Can I take you back to your California law argument? I understand that California, and indeed other states, permit lawyers in settlement to negotiate not only for the payment of compensatory damages to their client, but also for the payment of their fee in litigating that case. And sometimes there are questions about whether the lawyer has divided loyalties in those circumstances, and I understand California who have said that, no, a lawyer may do that. I don't understand California who have said that a lawyer, in settling his client's case, can solicit work from the party he's opposing so that he would then be representing that party in the future as well as the client for whom he's settling. Did I miss something in California law that authorizes that? The California rules of professional conduct would have authorized that situation if both clients had provided informed consent. Well, but we know that Mr. Franklin never provided consent to any of this. Well, before any agreement between Mr. Avenatti and Mr. Garagos and Nike to conduct an internal investigation could have been effectuated, it would have been necessary to secure Mr. Franklin's consent. But there is some language in the California standards that suggests that a client is supposed to be advised of the settlement offer, presumably being made by him, and Mr. Avenatti never advised Mr. Franklin that he was going to try to seek for not only $1.5 million or approximately $1 million in compensation, but a situation where Mr. Avenatti would come to represent Nike and do an investigation for them. I mean, there's the conflict, because is he at that point serving Nike or is he serving Franklin in doing that investigation? So, let me, a couple of things, Your Honor. First, at that juncture... First deal with whether you're telling me California has said it's okay when negotiating a settlement for one client to solicit from the opponent legal business in the future and negotiate the fees for that as part of settling the original client's case, because I didn't see that. The only datum on that point in the record appeared in expert notice provided by Mr. Avenatti with respect to his legal ethics expert, and this is... Which the jury was entitled to reject. I mean, this is what I would charitably call a curious negotiation, and you're arguing to us that the jury as a matter of law could not find that it was extortionate by the lawyer, and I'm having trouble with that. I mean, I understand you have arguments, but I don't see where, as a matter of law, it could not have been extortionate. What I would say, Your Honor, is this. What I would say, Your Honor, is this. Even if the demand... And I would question the premise that it's an unusual arrangement. As I was saying, Mr. Avenatti's expert notice, which appears at docket 96-1, indicated that had she been called, his legal expert would have opined that this sort of arrangement was, in fact, not uncommon. Let me also say that at this juncture, Mr. Franklin would have been a former client and not a current client, because his claims would have been resolved before Mr. Avenatti and Mr. Garagos went on to conduct the investigation. California Rule of Professional Conduct 1.7 allows for the waiver of conflicts of interest as to former clients in prospect of representation of other clients. And at the end of the day, our argument boils down to this. Even if you disagree that this was a legitimate investigation, even if you think that all Mr. Avenatti was doing was seeking his own compensation from Nike, which is the blackest interpretation of the record, but even if that's what you conclude, Judge Park, to return to your question, that demand did not convert a lawful threat into criminal extortion, because in light of California law, and in particular Ramirez, Mr. Avenatti can reasonably believe himself entitled to seek his own compensation. Indeed, California law authorized him to do just that. Thank you. The honest services fraud count should be reversed for two independent reasons. First, as I've just been discussing, a jury could not have found could not have found legally sufficient evidence to find intent to defraud in light of the clear relationship between the internal investigation demand and Mr. Franklin's objectives of securing justice and removing the corrupt executives. Independently, the count must be addressed because the government failed to prove that Mr. Avenatti offered to take any specific action in exchange for a bribe. What the government really charged in this case... Did he offer that he'd get his clients to agree to this settlement? He did not say that, Your Honor. All right, well, we'll hear from the government as to what their evidence is. No, if I may, what happened was a settlement negotiation. There was never any evidence, and by the way, two out of these three meetings were recorded, so there's little debate about what occurred. Never did Mr. Avenatti say, I will pressure my client to accept the settlement. No, I understand it wasn't that blunt. Okay, never did he say, I will get my client to accept the settlement. What he said is, these are the settlement offers I am making to you. Now, the reason it's problematic is that this is sort of this idea that the specific action that Mr. Avenatti promised to undertake in exchange for the bribe, the idea that it was causing Mr. Franklin's claims to be settled, is a late-breaking development. It's clear from both Judge Garfield's order denying the motion to dismiss Count Three and from the colloquies cited in our briefs that the government's true theory here was that Mr. Avenatti was seeking payment in exchange for refraining from holding a press conference. That was not honest services fraud. Indeed, during the charge conference, there was debate about how the quid pro quo should be defined, and Judge Garfield commented, and the debate at the charge conference was, should the jury be instructed that Mr. Avenatti had to take action favorable to Nike, or should the jury be instructed that Mr. Avenatti was promising to take action that would help Nike avoid harm? The government argued successfully for the latter instruction, and as Judge Garfield commented at that time, the action favorable to Nike problem didn't really fit the facts of this case. What Mr. Avenatti was offering to do in exchange for a payment from Nike was to refrain from disclosing Nike's misconduct. That is, to refrain from taking action that would have caused Nike reputational harm. That's not honest services fraud because refraining from holding a press conference was not a breach of any fiduciary duty that Mr. Avenatti owed to Mr. Franklin. I have one more question about the payment that was demanded. When it was first demanded, am I correct that he demanded that $12 million of the money be paid as Dean Dern went pay? Yes. So that would have suggested that he would get $12 million and he wouldn't have to do anything. Respectfully, Your Honor, he did make that demand, but he also said that the minimum value of the internal investigation, or the minimum payment due him, would be $15 million, so he necessarily contemplated doing some additional work to earn the minimum of the contract. Maybe. I mean, he made sure he was guaranteed $12 million, whether he did anything or not. I read a proposal for a $15 million minimum payment to necessarily imply additional work, and moreover, the parties... You can argue that. I'm just having trouble understanding why the jury couldn't reject it and think that, well, what he was doing was at a minimum, he's getting $12 million, his client's getting $1.5 million, and he believes the leverage he's using is telling Nike he won't hold a press conference. And if I may, on that point, Your Honor, if Nike had actually ever made such a settlement offer, and Your Honor, in an earlier question, commented that Mr. Avenatti had not conveyed a settlement offer to his client, then I must respectfully resist that because there never was any settlement offer made in this case. Made by your client. This was what he was offering to settle for. Your Honor, Mr. Avenatti made demands of Nike as a plaintiff's lawyer. Okay. But as Your Honor is no doubt aware, from the briefing, the rules of professional conduct only required Mr. Avenatti to report to Mr. Franklin a written offer of settlement, which never occurred. Thank you. Thank you, Mr. Chairman. May it please the Court. My name is Matthew Podolsky, and I represent the United States, as I did at trial. Maybe I could pick up where we left off, which was with some questions about the sufficiency of the evidence on the honest services fraud count. Mr. Rabin characterized the government's true theory on the honest services fraud count, but I'm just going to quote from a summation that the government made exactly what theory the government advanced to the jury, which is this. That Michael Avenatti's demand was, quote, Pay Avenatti, and he tells Franklin to settle his claims. Don't pay him, and he takes Franklin's information public. That is a request for a bribe, and that is a crime. That is the theory that the government advanced at trial. Thank you, Your Honor. I'm at appendix 640, which is the trial transcript summation. And the reason I emphasize this is that that theory encompasses specific action to be taken or not taken by Mr. Avenatti, depending upon the payment of a bribe by Nike. In particular, if Nike paid the bribe, Avenatti would tell Franklin to settle his claims. That is an action, and he would forestall publicizing Franklin's confidential information, also an action, and both within the scope of Mr. Avenatti's duties to Franklin. I believe there's a question about the government's evidence on this point. We've certainly... I'm certainly not going to try to recapitulate what we've said in our brief, but I will emphasize or draw your attention to a few things. The first is the main evidence in this case, which was recordings of what Mr. Avenatti actually did say to Nike's attorneys, as well as the testimony, in particular, of Scott Wilson and Robert Leinwand, Nike's attorneys who received the extortionate threats. And what the testimony and the recordings show is that Mr. Avenatti said clearly, conveyed clearly, that in order for Mr. Avenatti to cause the settlement to be approved by Franklin, both things, which is, I believe, how Scott Wilson presented it, both things had to be satisfied, meaning a $1.5 million payment to Franklin and the hiring and paying of Avenatti. And... Well, let me choose an example that I have at my fingertips. I believe in the appendix that 860 is one of the recorded calls. And during that call, Mr. Avenatti essentially conveys it's worth more exposure to me to just blow the lid on this thing. This is actually a quote. A few million dollars doesn't move the needle for me. And he goes on to say, and if you are only going to pay me five or six or seven million dollars, then that's not going to be sufficient. Well, that's clearly conveying that if his demands aren't meant to pay him, this matter is not going to be settled. And I'll just draw our attention to one other fact, which I think sort of completes the picture. An important fact in the case, which is that Mr. Franklin was never told about any of these discussions. That's important for a number of reasons, but in particular as to the honest services fraud, what it shows is that Mr. Avenatti was waiting to convey the settlement offer that he would propose to Mr. Franklin, depending on whether he paid a bribe to Mr. Avenatti. And so when you take these pieces together, the jury was certainly entitled to conclude that Mr. Avenatti solicited a payment from Nike in exchange for taking action with respect to Mr. Franklin's claims. If it played out that Nike had agreed to this proposal and Mr. Avenatti had gone back to Franklin and told him this is it, and Franklin thinking he got his 1.5 said okay. Do we have a denial of honest services in that circumstance? I think that if Avenatti had conveyed the entirety of the negotiations, of the format of the exchange about what he was getting, and then perhaps there would be some argument, or at least a better argument to the jury about what Mr. Avenatti's intent was. But I will say that if the jury credits that it was Mr. Avenatti's intent to be influenced in his representation of Franklin, in particular to take an action, by a payment, those are the elements of honest services fraud. Well, there were some draft settlement letters in the record. Remind me whether the record, if the letter indicating what is the retention of Mr. Avenatti, was that a separate document? Thank you for raising that question. It's the latter. Nothing in the draft settlement agreements that Avenatti was typing on his computer, you can see him doing some work, I think, in the video, referenced in any way the notion that Mr. Avenatti would be hired by Nike or paid anything. It was simply a settlement agreement that referenced the $1.5 million payment to Franklin. And, of course, that's consistent with Mr. Avenatti's conduct throughout this period, which is not to tell Franklin anything. Well, viewing the evidence in the light most favorable to the guilty verdict, which is what we're required to do as he's suggesting, that means that a jury could infer that he'd get told about the $1.5, Mr. Franklin, but perhaps never told about the retention agreement. That is, Your Honor, and to be clear, that's exactly what was argued to the jury, that they could make those inferences about Mr. Avenatti's intent. That's what the jury concluded. That's what Judge Vardife concluded as well in upholding the verdict. And as Your Honor points out, the question isn't whether the defense now can come up with some other story that might be innocent, it's whether the evidence here was sufficient to support the jury's verdict and the inferences that it drew. And it certainly was, based on the recordings, in particular, as well as the testimony of the witnesses in this case. Could I turn you to extortion and wrongfulness? You make an argument about the size, the comparative size of the $70,000 contract and the $15 to $25 million demand. What if the internal investigation demands just a billion dollars? Does that change? Yeah. Thank you for that question. I think it's something I wanted to get to in this argument. The answer is no, it doesn't. It's still extortion. So I think the size of the demand, the $12 to $15 million is relevant in a few ways. Let me first address there's some back and forth in the briefs about the nexus, potentially, between this claim and the legal claim and the size of the claim. And the reason the back and forth is focused on language in Jackson 1 and Jackson 2, which talks about two ways you can show wrongfulness. One is to show that the defendant does not have a claim of right or a belief in a claim of right. And the second talks about this nexus idea. I'm happy to talk about the nexus idea, but that's really not the focus of the government's argument. And I do think it is slightly more confusing to understand that in Jackson. So I want to focus on the claim of right and why, to your question, Your Honor, the size of the demand mattered or didn't matter. So the answer is, Mr. Offenheide had no claim of right, no plausible claim of right, and the jury concluded, based on sufficient evidence, did not believe he had a plausible claim of right to demand any money or any employment from Nike. So if he had demanded, I think Your Honor mentioned, a million dollars, it was wrongful as well. So the amount compared to size doesn't really matter. I mean, it's that he didn't have a claim of right. Absolutely. The reason I sort of draw this out is to say nonetheless, the amount of the demand was powerful evidence that the jury was entitled to consider about the defendant's intent. I mean, the mere size itself was relevant. The fact that the $12 million demanded coincided with his ability to recover from the $11 million in debt that he had was relevant, I think, to the jury's determination of his intent. And in general, the negotiation over the price was an important element of the conduct here that the jury needed to consider. Reviewing all of the negotiations, step back for a moment and see, this is not a negotiation over fees that anyone would recognize. There's no legitimate or serious discussion of what the claims are here. There's no actual discussion of what the investigation looks like. There's simply numbers thrown out by Avenatti, and numbers bounded by what he says is essentially $5, $6, $7 million isn't enough. And he uses some colorful language that says essentially that I have your client between my hands and can squeeze, and that's why those numbers are not enough. So I just emphasize this to say, I think the amounts are certainly relevant to the jury's determination and are important evidence, but the wrongfulness doesn't turn on the amount demanded. Let me ask you with respect to that, I mean, it's clear that what Mr. Avenatti was threatening Nike with was a press conference that would then have an adverse effect on the company's stock. In honest services fraud, I mean, that may be extortion, but in honest services fraud, how is that a violation of the honest services owed to Mr. Franklin? He's step one in this settlement is he gets Franklin the $1.5 million. So to that extent, he's getting his client what he wants, and he's doing this other thing to get his own benefits, looking at it favorably to the government, and uses the press conferences as a leverage. Why isn't that what he offers to do, is call off that press conference, not get the settlement. Everybody knows that Mr. Franklin is going to be delighted with $1.5. So, I think I have two responses, Your Honor. I think, first of all, I think the jury was certainly entitled to agree with the government's argument that part of the bribe here, the action that was conditioned upon the bribe, was telling Franklin to settle his claims. And that is the theory. And that is the theory that we put to the jury. I will say, however, that even if it were just a matter of calling off the press conference, I think that would still support an honest services fraud conviction here. That is certainly still decision making within the scope of Mr. Avenatti's representation of Gary Franklin deciding how to press his claims, and if Mr. Avenatti is making decisions that impact how to press Mr. Franklin's claims in exchange for a payment from somebody else, that reaches the elements of honest services fraud. This gets a little complicated, because as I understand the presentation of the evidence, Mr. Franklin didn't want a press conference. He didn't want to be exposed and all of that. So, by offering to cancel the press conference, that may have been more in Mr. Franklin's interest than holding it. Am I right? I take your point, Your Honor. Certainly, the first document on the settlement is a simpler one. But I'm not sure that under the law, this sort of question of what ultimately is in the interest or not in the interest of the client is really the right framework. Is that the honest services? Well, what I'm thinking of, for example, is in the public official context. There's law that says, essentially, if the action that the official solicits the bribe for is action that is nonetheless in the interest of the public, and nonetheless what he would take anyway, that doesn't render it any less of a bribe. The core here is taking an action within the scope of your fiduciary duties in exchange for the money. So, maybe it wouldn't have harmed Franklin in the same way, but I'm not sure that changes the crime itself. Your Honor, I'd be happy to address, if it would be useful to the court, the other arguments, mainly the jury instructions or the restitution issues. But I will just say to conclude on the sufficiency of the evidence, the evidence here was sufficient to support the jury's verdict. One could come up with theories, I suppose, alternate theories of the case, but that doesn't mean that the jury wasn't entitled to render the verdict it did. The evidence was very strong in this case. And actually, maybe one other comment I'll make on this is there was a colloquy about Ramirez and the California law and whether it authorized this conduct. I don't want to go deep into this, only to say I found the whole application or putative application of this strain of thought very odd. What those cases are about is if you have a civil claim where attorney's fees are authorized to be paid by the other party, when and in what circumstances it's appropriate to negotiate those. That has no relevance to this case at all. I've looked through the record. There's nothing about Mr. Avenatti demanding or negotiating attorney's fees for his representation of Franklin from Nike. He never says that. What he says is, I demand that you hire me and pay me for this other thing. And so it's not clear to me why this California law has any application in this case. Let me ask you a question about your theory on restitution. Are you taking the position that Nike would be entitled to restitution of the expenses it incurred in cooperating with the government, even if it had not incurred any other expenses? Or are you taking the position that there was an independent law, namely the expenses Nike incurred in council meetings with Avenatti before going to the government and that that supports then, or that amount supports bringing in all of the other expenses? How are we supposed to look at this? So I think the answer to your question, which you may not like it yet, we're arguing both, really. Either one. Exactly. Let me start with the first argument, which I think is the argument that Judge Gardoff embraced, which is that there's no need for additional expenses. The fact that Nike was forced to incur expenses and to cooperate with the government's investigation,  mandates restitution. Well, it has to be foreseeable. So you're saying that if you're injuring someone, the likelihood that they will go and seek government help is foreseeable. That's exactly what we're saying, Your Honor. And on this, we would cite United States v. Amato, which says clearly that those, I think it was both attorneys' fees and auditors' fees caused by cooperating with the government was a direct and foreseeable result of the defendant's crime. That fits it right into the MVRA, which says essentially a victim is somebody who incurs harm or loss as a direct and foreseeable, or I believe he uses the word approximate, result of the defendant's crimes. So essentially, you put those together, and because the costs associated with this investigation were direct and foreseeable to the defendant, those alone make Nike a victim in this case and entitled to restitution. The reason I say... I'm sorry. Can I ask a quick question on the timing of the first season? Is your argument that if there's notice, that just stops the 90-day clock and there's no limit on when it can be worked? So, I think in practice, the answer is yes. I think our argument is really that under Bolin, the 90-day clock is a directive to judges that you should do it in 90 days, but it's not a jurisdictional rule. So if the judge fails to do it, there's no penalty to the victim, really, by essentially invalidating that restitution. At least where the intent to impose restitution is clear. That's what Dolan says, right? So Dolan does include the language which it uses to describe the circumstances there. It says, in effect, at least where it's exactly as your Honor says. If you look at the reasoning of Dolan, though, it's not a blank check. Basically, what Dolan is really saying is, one, this is not a jurisdictional rule. It's not a jurisdictional rule. So it is completely lawful for the court to issue or order restitution even after the 90 days. It should issue it within 90 days. Here, the timeline is essentially that within a few weeks of sentencing, the parties submitted their supplemental restitution claims or arguments, and it took about six months for that to be ruled upon. Dolan says clearly that there's no jurisdictional defect there. The court is entitled to award restitution, and in fact, that it would be contrary to the purposes of the statute if the victim then suffered because the court failed to act within the 90 days. And then on the notice question, Dolan has some commentary that I think is really relevant here, which is it's really on the defendant to object if it goes beyond the 90 days if he feels he would be prejudiced in some way. And I think it's important to note that the defendant did not object to this here. He sat by and waited. The defense and their appellant and their defense said pages 28 to 29 cite some district court docket entries claiming that those prosecuted objections to going beyond the 90-day window, they didn't. All of those submissions were well before this. None of them say, Judge, please rule within 90 days. In fact, there's a quotation I noted to a letter the defendant submitted that quoted the time provision, and there was an objection to going beyond the 90 days. Well, the problem is the letter actually was submitted before sentencing. It was a request to adjourn sentencing because the defendant wanted more time to address restitution. And it cited this provision not for the 90-day rule. It cited it because also in that same provision, it says essentially that if restitution isn't clear 10 days before sentencing, you can request additional time. So the defendant never objected on this, never suggested that there was an issue with going beyond the 90 days. And that's why this first should be reviewed for plain error, and second, there cannot be possibly a claim of prejudice here by the defendant. Unless the court has any other questions, we'll rest on our briefs. Thank you. Thank you. Judge Farquhar, when the government told you that its analysis of wrongfulness would not differ if the amount sought for the internal investigation had been a million dollars, the government was proposing quite a broad scope for these federal criminal extortion statutes, at least in the context presented here, a plaintiff's attorney engaged in active settlement negotiations with a putative defendant. What the government is saying is that any time an attorney asks for his own compensation in the context of a settlement negotiation, conduct that Ramirez clearly authorizes, that that attorney has committed extortion. I'm sorry, I don't think that's the government's argument. I mean, it's not... They acknowledge that California says you can negotiate your compensation for the work you've done in the case you're negotiating in. What I understood their position to be is that it's problematic and conceivably extortionate when what you're seeking is payment for the representation of the other party in the future in order to settle the case. I understand the government's position to be regardless of whether the payment is denominated or characterized as compensation for services, which by the way, the government doesn't actually believe that Mr. Avenatti intended to provide, but whether the compensation is characterized as payment for services or as fees to plaintiff's counsel, the government is saying that every dollar Mr. Avenatti got from Nike was a dollar that came out of his client's pocket and for that reason it was wrongful. That rule has potentially limitless scope. Do we have to even consider that in a case where the evidence is that the demand was for $12 million no questions asked, $15 million minimum? We're talking much much more than a million dollars. Do we have to even consider what a lesser demand would support or not support? Based on the way this case was tried and charged, the jury, with respect, yes, Your Honor, because the government disclaimed the relevance of the amount of the demand below and the jury was so instructed. If I could address the honest services claim, here as well the government is proposing again, quite a broad and aggressive interpretation of a statutory provision that the Supreme Court has repeatedly told lower courts to construe with more discipline. And Judge Raggi, you have it right. If Mr. Avenatti had come back to Mr. Franklin and said, gotten $1.5 million and we're not holding a press conference, Mr. Franklin would have been over the moon. There's no suggestion in that situation that Mr. Avenatti would have accomplished anything other than achieve his client's objectives. What's necessary to prove honest services fraud is not just self-dealing. The Supreme Court's decision in black makes that clear. It's not enough that a defendant engage in a breach of fiduciary duty for private gain. What's necessary is a bribe. A secret payment in order to procure specific action. And there simply was not evidence offered in this case that Mr. Avenatti was proposing to take any specific action with respect to Mr. Franklin's claims. Indeed, only Mr. Franklin could have settled those claims. Now the government read to us their summation in which they quite bluntly said that Mr. Avenatti took the position that he got paid and he'll tell Franklin to settle. They argued that to the jury. So is that a sufficiency argument that no matter what they argued, the evidence didn't support what they argued? Yes. Okay. I adduce the parties back and forth as to the correct formulation of the honest services instruction, only as evidence to show how this case really proceeded. And the way this case really proceeded, and again, the court can also look, in addition to the colloquy cited in our brief, I'd encourage the court to look at Judge Gardafi's analysis in the order denying the motion to dismiss count three, which, describing the indictment in this case, says that quid pro quo theory being advanced here is that Mr. Avenatti demanded money from Nike, however those funds were characterized, in exchange for forbearing to hold a press conference. And that would not have been honest services fraud for the simple reason that forbearing to hold a press conference would not have breached any fiduciary duty to Mr. Franklin. But the government argues that it didn't argue that. And I just want to be sure that you either agree or don't agree that what the jury heard was that Avenatti promised to go back to his client in return for Nike's payment. I don't disagree with the government. That's what they argued. Of course, in the sufficiency posture, this court is looking at the evidence actually put before the jury. I know the court has heard more from us probably than it wanted to, but I can't address the restitution if the court has specific questions. Why don't you take a minute to say what you wanted to say. Thank you, Your Honor. The restitution order should be vacated for two reasons. First, the district court backed authority to award restitution 221 days after sentencing because it had not provided the notice required by Dolan. And I do want to make very clear that what occurred at the sentencing was not the kind of dispute that was at issue in Dolan, i.e., a dispute about the amount of compensation. Indeed, at sentencing, Mr. Avenatti disputed that Nike was a victim at all. And he continues to dispute that Nike was a victim. And so when Judge Gardafi said he was deferring a determination, he was not deferring merely a determination as to the amount but as to the question of whether restitution would be ordered at all. That's not the kind of notice that Dolan requires. Second... Well, it's an implicit in it that if you show me, if you come forward with evidence, I'll consider a restitution order. And they were given time to do that. I mean, why isn't that notice too fine that restitution is still an open question in this case? It may well be, but that's not the kind of notice that Dolan contemplates, Your Honor. Dolan talks about notice that restitution will be ordered, not that it's an open question. And this Court's post-Dolan cases have made the same point. They've repeatedly upheld post-90-day orders after pointing to comments in the sentencing transcript that restitution was a certainty, the defendant was on notice that restitution would be ordered, and it was merely a question of the amount. That's the kind of notice that was not provided here. On our second argument, the District Court could not have awarded restitution because Nike's only pecuniary loss here was its attorney's fees. If I may, it may be stated most clearly in the reply brief, and I'll simply put it this way. Section 3664 F1A requires an order of restitution to compensate the defendant for all losses. And if losses incurs attorney's fees, sorry, if losses encompasses attorney's fees, as the government has argued, then the specific provision in 3663A B.4 authorizing the payment of those fees is superfluous. It's clear that the statute distinguishes between losses, which are prerequisite to restitution on the one hand, and other expenses. That's the statutory term that captures the attorney's fees at issue here. Thank you. Thank you. The next argument before the calendar is case number 212531 Fox v. Starbucks. Mr. Brown, are you ready? Thank you. Good morning, Your Honors. May it please the Court, I represent Raphael Fox, Paul D'Oria, and Jill Schweiner, and they're appealed from the District Court Grant of Summary     Raphael Fox, Paul D'Oria, and Jill Schweiner, and they're appealed from the District Court Grant of Summary. I'd like to focus in first on Plaintiff Fox's retaliation claim under the New York Labor Law, based on his complaint shortly before his termination about the deployment of DPVP-containing organophosphate-toxic pesticide devices in his former Starbucks store in Manhattan. The record reflects that in practice, they've been found throughout the Starbucks locations in Manhattan, approximately 100 stores for a period of years, and that Starbucks even apparently reimburses stores for the purchase of these prohibited pesticides. The District Court agreed that Mr. Fox engaged in protective conduct by raising his complaint to Starbucks' senior compliance specialist. The District Court also agreed that the decision makers on his termination 28 days later were aware of Mr. Fox's protective complaint. But the District Court nevertheless concluded that summary judgment must be granted because Starbucks proffered a legitimate and non-retaliatory justification for terminating Mr. Fox. Specifically... Counselor, before you get there, could you fill me in on facts relating to whether McDonald told Ruffin that he had made this report or not? Because apparently my understanding is that McDonald testified that she never told Ruffin, and Ruffin testified that she didn't know of the report. And Ruffin was the person with the decision-making authority which resulted in Mr. Fox's termination. That was their testimony and we agree with the District Court that the evidence in the record supports the inference that despite their denial of McDonald having told Ruffin, the fact is that a decision was reached to terminate Mr. Fox at the end of a meeting in which McDonald participated. McDonald... Tell us about the inference because my understanding of the inference is that McDonald said that she was going to report it to me. That's wrong. Very confusing. But that she testified that she did it. I believe Your Honor may be thinking of Mr. Hutchinson who was a... That relates to Mr. Fox's complaint. What is the inference of that... What is the evidence with respect to the inference that Ruffin knew about the report on the pesticide? All Starbucks managers have an obligation under policy to immediately escalate health or safety concerns and to report them up the chain to appropriate persons. So presumably she would have done that. Her own supervisor was also in the meeting and she was also in the meeting and the inference is that the information would have been exchanged in the context of discussing Mr. Fox and the fact that he had very recently complained to her. She testified she recognized that he was upset. He was warning about a risk especially to children being unknowingly exposed to this. May I ask you if you have a case that supports the conclusion that at jury trial when the evidence is presented and the witness denies that anything was said at the meeting, the jury can certainly not believe that witness, but I'm not sure that then allows it to conclude without any evidence that the matter was discussed at the meeting. Do you have a case that says that that's permissible? I don't have one specifically on that point but there is other evidence to suggest that their version of the meeting is not worthy of credence. For example, Ms. McDonald at the meeting allegedly said that Mr. Fox had failed to correct certain errors she had pointed out to him when in reality there's a written text message in the record of her instructing Mr. Fox to not do that. In the meeting Refn allegedly... Those are separate I understand that but to the extent the district court relied on the permissibility of drawing an inference that something that the witness said was not said was in fact said, you don't have any evidence. I think it might be that the jury simply has no evidence on what was said at that meeting. The jury would have to infer from other evidence that that was said in the manner that the district court, I mean as far as the case, there's the district court's analysis here and I think it goes to the totality of the circumstances people involved, the subject that was being discussed and whether or not a jury could find that it's plausible or believable that something this important would not have been discussed in the context of that meeting given that it's particularly self-serving to Starbucks benefits simply to deny that they considered it when by their own policy that should not have happened. That's something that should have been... The client was told to tell Mr. Hutchinson about it, right? When he first mentioned it, he was told to tell Mr. Hutchinson about it? He was. He also... And he did not? Not before he was terminated in the following week. So he didn't... Starbucks didn't say to him, don't say that. Starbucks told him to report it to someone who would have some authority and your client didn't pursue it, right? Not at that point. You want an inference that someone whose responsibility was HR rather than any responsibility for the conditions that the particular site would have used this negatively against your client, right? Yes, Your Honor. Somebody who's in the HR environment who gets an urgent complaint like that from a worker would presumably have done something herself, and I think the testimony from her own supervisor is that her supervisor would have expected her to have relayed that information, although she testifies that she did not. And that's a gap that we believe the jury could reasonably fill with the assumption that it must have been communicated. You did say actually that the court found even though your client may have made out a crime of case that they had a legitimate reason for terminating him, and I gather that this did result in an inquiry into the conduct here and that Starbucks was fined or penalized in some way for the mistakes made. Why isn't that implicated that they did have a legitimate reason for letting him go? Your Honor, the reason for that is that Mr. Fox was one of four stores that were investigated on the same day, and the issue was the posting of schedules with advance notice under that new Fair Work Week legislation. Mr. Fox was found to have made a mistake on four schedules. Two of the other stores also had four schedule mistakes, and the fourth store had all of the schedules were posted late. So Mr. Fox was found to have made a mistake on four schedules. There was also some issues with his transparency during the investigation, weren't there? Correct, Your Honor, and we believe that each of those three is demonstrably false by the person who advanced it. McDonald said, we can't trust him because I directed him to correct these deficiencies, which he in fact did. Is there evidence that there were pretexts, or is it just that they were false? There was a pretext that they were trying to invent reasons to make Mr. Fox's situation different from the other employees so that they could justify terminating him when in fact his Fair Work Week violation was no different than, in some cases, better than the comparator stores, and when the decision makers appeared to three of them who participated in the meeting, Mr. McDonald, Ms. Ruffin, and Mr. Jennison, each one of them advanced a basis to not trust Mr. Fox that was by their own written close-in-time words not true, and we would submit they should have known that, and that it's evidence of pretext if they're padding up the reason for Mr. Fox being singled out for termination with things that they have first-hand direct knowledge of being untrue. I see my time... Thank you. ... ...  ... Good morning, Your Honors. My name is Debjani Mishra. I'm here on behalf of Eppley Starbucks Corporation. Very simply, the District Court's decision granting summary judgment to Starbucks should be affirmed in all respects. As to Appellant Fox, the District Court properly dismissed his retaliation claim and will take the FLSA and New York Labor Law claim first relating to his complaint of underpayments. The Court correctly found that there was no causal connection between Mr. Fox's complaint of wage underpayments by a predecessor who had already been terminated at the time the complaints were made, and Mr. Fox's own termination more than three months later. Because the sole decision-maker had no specific knowledge of this complaint. As Your Honors recognize, Ms. Ruffin testified that she was not aware of the complaints of underpayments because Mr. Hutchinson, the District Manager, did not relay those complaints once he himself found that there was no issue there. He did not relay an unsubstantiated complaint to Ms. Ruffin. She had no knowledge of it. With respect to the second retaliation claim, which is under the New York Labor Law only, the District Court correctly found that Starbucks Business Reasons again, his violation of the Fair Work Week law, was not a pretext for retaliation. Collins Counsel referred to Mr. Fox being singled out. It's important to know that he was not singled out. He happens to have been the first Starbucks store manager to receive an actual complaint from the Department of Consumer Affairs filed by an employee alleging violations. This was a new law. Starbucks had invested quite a bit in training managers to be sure that they would comply with the law and had in fact hired Ms. McDonald, who Your Honors refer to, to be a compliance specialist to focus specifically on that law and assist store managers and investigate complaints and issues as they came up. That was her purview. She was not a general manager or some sort of free-floating HR or safety representative. She was in Mr. Fox's store because there had been a complaint. In the course of her being there, Mr. Fox claims that he made a general statement about pest strips being used in some other stores, which Ms. McDonald told him to take to his district manager, the person who would be able to investigate that. There was, as Judge Rauji, as you might or please be quiet implied there, the suggestion was that the matter should be escalated to the people with responsibility to deal with it, who would not have been Ms. McDonald. Judge Walker, you had asked about the inference. Not only did Ms. McDonald testify that she did not tell Ms. Ruffin and Ms. Ruffin testified that she did not hear it from Ms. McDonald, there was a third witness, Ms. McDonald's supervisor, Rachel Kelly, who was also present at the termination meeting, who also testified that she was not aware of the pest strip complaint. Nonetheless, the district court gave appellant the benefit of the doubt on this and treated it as though it was enough to get past the prima facie case stage, but then correctly found that Starbucks' reasons for terminating Mr. Fox's employment were not a pretext for retaliation. Again, Mr. Fox was the first. He was not the last. Another store manager was terminated on the same basis four weeks later, and in total, nine store managers were terminated during 2018 for this reason. Mr. Fox happens to have been the first one up. This is something that Starbucks took very seriously, and it was no way a pretext for retaliation on any basis. As to the negligence claim that is raised here by appellants Deoria and Schweiner, the district court correctly found that Starbucks contracted with their employer, AVP Termite and Pest Control, to provide pest control services, including identifying and removing unauthorized pest control devices from Starbucks stores. The record contained ample undisputed evidence that appellants Deoria and Schweiner understood this to be part of their work, that they performed such work over a period of years, that they corresponded with Starbucks about the charges for performing these services, the fees that would be charged. And as such, the court properly applied well-settled New York law and found that Starbucks did not owe Deoria and Schweiner a duty of care to protect them from hazards that are inherent and foreseeable in their work or in the condition that they were to provide pest control services. Further, even setting aside the duty of care issue, their claim lacks the required guarantee of genuineness under New York law for a negligent infliction of emotional distress claim. Whereas here such a claim is premised on exposure to a toxin, a plaintiff must establish not only the exposure, but also a rational basis for fear of contracting a disease or illness as a result of that exposure. And a rational basis is explicitly narrowly defined under New York law to mean either the demonstrable presence of the toxin in the plaintiff's body or a physical manifestation of some sort of contamination. Here there is no evidence to support any of this. Appellants did not proffer any evidence that the toxin was actually present in their bodies or that they had suffered any symptoms of any toxin-induced disease. And appellants essentially do not acknowledge the law or provide a reason to depart from this precedent, but merely argue that it should not apply because of the exposure itself. That is not the standard for evaluating these claims. The district court correctly rejected this argument and respectfully we submit that this court should do so as well. Thank you. Thank you, Your Honor. Very briefly to go back to Mr. Fox. The record was that he would not have been fired necessarily solely because of the Fair Work League violations. It was only that in combination with the three other factors that are shown to have not been true and that this throws into doubt the argument that there's a neutral, sufficient justification. The record also doesn't demonstrate that anybody else was fired solely because of Fair Work League violations. The witnesses did not say that. They could not give names or explain what other factors might have been involved in those individuals' terminations. There is a record there to find from those subsequent terminations if they happened, that they support Mr. Fox's treatment, which again wouldn't have happened in the absence of the trust factors based on demonstrably false reasons. Turning to Mr. Dorian and Ms. Schweiner, the district court coupled together from the very long record three ambiguous emails for the proposition that this was part of the job that Dorian and Schweiner were contracted to provide, that is, to patrol Starbucks stores for pesticides placed in violation of Starbucks policy and to just throw them out when that came up. The record shows it was not in their scope of work duties. They never charged any funds for doing that and they consistently, upon encountering these devices, complained that it's illegal and they can't be there. Not that they don't like as part of their job having to do that part of the job, that it should not happen at all and it continued to happen. The fact that it continued to happen doesn't transform it into their job to be reporting to Starbucks, incidentally, as part of their job, which was integrated pest management control, tracking cracks and entry and exit ways, breeding grounds to with non-pesticides remediates pest manifestations and so on. What about the argument Starbucks makes that you haven't satisfied New York law's requirement to show either the level of toxin in your client's blood or the other manifestation of disability? Your Honor, on that point, the cases addressing, that counselor was relying on, arise in a very different context and a different way than the exposures here. In those cases, it's generally, somebody lives in the vicinity, say, of a gas station and later learns that there were toxic fumes and the courts say, well, if you're going to say that this is causing you emotional distress, how do you know what your exposure was, if it was meaningful or not, you need medical evidence. Here, Mr. Dorian, Ms. Schwanger, Dorian in particular, had toxic pesticides spraying or fogging up into his face on his body and he says immediate perception and immediate terror and in that scenario... I don't understand. I thought the hot shots were something that were placed there. I didn't think that was a spray. Am I wrong about that? The hot shots are something that's placed there and is vaporizing, but the record and we also cited in our brief other incidents when Mr. Dorian would walk into a store and things would blow up in his face by literally other versions of pesticides that also shouldn't have been there and it was the repeated cumulative exposure that was known to him. He didn't need a doctor to say you've been exposed in a meaningful way because it was literally dripping off of him or piled in front of his face. Well, that all depends on what kind of exposure, what the toxin is and what kind of exposure causes harm. So your clients have no evidence of toxin in their systems or any illness at this time? Not about blood tests showing the fraction that was in their body. The record also doesn't show that such a test existed at the time, but Mr. Dorian is a lymphoma survivor. He did testify that he discussed it with his doctor and she told him it's not good for you. Ms. Schweiner discussed it with her cardiologist who also told her it's not good for her. Mr. Dorian also reached out to outside experts in the field, including Dr. Fry, who told him that it's absolutely dangerous at any of the levels that you're encountering it. Given the slightly different factual context, we would submit that the requirement in other cases for some medical proof of the fact of exposure in a way that's dangerous would simply be redundant here, where the exposure was immediate and dramatic and they know from subsequent discussions with their doctors and government regulation on point that it is dangerous and should not happen to them, particularly with their pre-existing health conditions. I see I'm past my time. If the court has no other questions, we would rest on our briefs and respectfully request that the result below be reversed. We thank you for your advice. The last argument for today is in case number 21-2084, Rostock v. Montefiore. Good morning. May it please the court. My name is Daniel Alteras and I represent the appellants. We are here today because the district court dismissed my client's sexual harassment claims and personally sanctioned me, my client, and my firm over $157,000 because they decided to believe Applebee's text message expert and completely disregard our client's text message expert. In short, the district court made credibility determinations which should have been based on the legitimacy of certain text messages, which remains an ongoing dispute between the parties and their respective forensic experts. Your Honors, respectfully, I did nothing wrong. Under oath, my client testified from a place of personal knowledge that the text messages in dispute were genuine. Thereafter, her expert testified based on his own forensic knowledge that the text messages in dispute were genuine. There was no fraud on the court. It was merely an issue of fact as to the legitimacy of certain text messages. As such, appellants respectfully request that Your Honors vacate the district court's decision dismissing this case, issuing sanctions, and remand the case to another judge for further proceedings. Why remand to another judge? At the evidentiary hearing, the district court made a credibility determination which we believe should have been reserved for the jury. It remains clear on the record that from that point on, the judge repeatedly dismissed, denied, failed to consider, essentially every argument that was made until the case was ultimately dismissed. We have plenty of cases that say the fact that one party constantly loses on motions and rulings is not a sound basis for refusal. Usually it's extrajudicial or some very flagrant activity by the court that indicates bias. A direct inference. So we submit that we would not be getting a fair determination on the merits including with respect to the disputed documentary evidence at issue? I have another point for you and it relates to your claim against you. And that is didn't the district court rule that you were responsible because you negligently or recklessly failed to perform your responsibility as an officer of the court on page 26 of the district court opinion? And that in fact, if you are acting within the scope of your client's representation, there has to be a finding, the law requires a finding in faith of your client. Did the district court apply the wrong standard? Yes Judge Walker, that is one of the points that we make in our briefs that the district court erroneously found my conduct sanctionable based on a lower negligent or reckless standard reserved exclusively for representational conduct. However, the conduct at issue in this case clearly involved representational conduct. Reserved for non-representational conduct. Right. If it's representational conduct, then the test is bad faith. And she didn't apply that standard. Yes, that is one of our arguments. And if the district court were to have attempted to locate that faith, they would not have been able to do so in the instant case. First, my client's testimony confirmed the legitimacy of these messages. That's a factual question.